UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DONALD SHANE BRINK, <br><br> Petitioner, <br><br> vs. <br><br> TIMOTHY WENGLER, <br><br> Respondent. | Case No. 1:13-cv-00039-EJL <br><br> **MEMORANDUM DECISION AND ORDER** |

Previously in this matter, the Court determined that a number of Petitioner's claims presented in his Petition for Writ of Habeas Corpus were procedurally defaulted, and that Petitioner should have an opportunity to show that the cause and prejudice exception or the miscarriage of justice exception should be applied to excuse the default of the claims. (Dkt. 31.) Petitioner has filed his response to the Court's Order, and Respondent has filed a reply. (Dkt. 37, 38.) Having reviewed the record in this matter and considered the parties' arguments, the Court enters the following Order.

## CLAIMS AT ISSUE

The following claims presented in the Petition for Writ of Habeas Corpus are procedurally defaulted:

- Claim Two, that Petitioner's rights were violated due to "unconstitutional jury instructions," either as a stand-alone constitutional claim or an ineffective assistance of counsel claim.

- Claim Three(1) that admission of photographs prejudiced his defense and Three(3) that admission of a second videotape of police interrogation prejudiced his defense, violating his Fifth, Sixth, and Fourteenth Amendment rights.

- Claim Four, that Petitioner's First, Fifth, Sixth, and Fourteenth Amendment rights were violated because he was not appointed experts to review the evidence.

- Claim Five, that prosecutorial misconduct occurred (both as a stand-alone constitutional claim and as an ineffective assistance of counsel claim, for failure to raise the prosecutorial misconduct at trial).

- Claim Six, that thirty instances of ineffective assistance of counsel occurred, at the pretrial stage, at trial, and on appeal.[1]

## BACKGROUND

Petitioner was convicted of the first degree murder of Brent Lillevold (with an enhancement for using a deadly weapon), and he was convicted of being a persistent violator, all in the same criminal action in the Fifth Judicial District Court in Twin Falls County, Idaho. He was sentenced to a prison term of thirty years fixed, with life indeterminate.

---

[1] Petitioner argues that Claim One is not procedurally defaulted. However, the Court already determined that Petitioner properly exhausted and could proceed on the access-to-courts sub-claim of Claim One. Petitioner may not proceed on the nonncognizable portion of Claim One based on the Idaho Constitution. Noncognizability is a different procedural bar not at issue.

**MEMRANDUM DECISION AND ORDER - 2**

Petitioner originally was represented in the criminal action by public defenders Marilyn Paul and Jonathan Brody. Petitioner did not believe they were adequately representing him, and they withdrew from the case. Several other attorneys were considered, and eventually Thomas Kershaw was appointed to represent Petitioner at trial. Throughout the trial, Petitioner attempted to file numerous pro se documents while represented by counsel, but the state district court rejected them and required Petitioner to file everything through counsel.

Petitioner was appointed counsel, Greg Silvey, on direct appeal. Petitioner disagreed with Silvey's decision to present only two claims on appeal.[2]

On post-conviction review, Petitioner initially requested and was appointed counsel, Tim Williams. Petitioner then filed a motion to represent himself, which was granted. (State's Lodging D-3, pp. 642-74, 679-80.)

Petitioner was appointed counsel on appeal of the post-conviction matter, Deborah Whipple, but she withdrew because she found no meritorious issues to present on appeal. Petitioner pursued an appeal of the post-conviction matter pro se. In the midst of the appeal, Petitioner filed a motion to re-appoint counsel, which was denied. Petitioner obtained no relief in state court.

In this case, Petitioner has presented a large number of claims and a large number of documents in support of his claims. Petitioner's briefing tends to be dense, disjointed,

---

[2] Silvey wrote to Petitioner: "I did not include anything about justifiable homicide because the record does not support such a claim." (State's Lodging D-2, Petitioner's Exhibit 97.)

**MEMRANDUM DECISION AND ORDER - 3**

and very difficult to decipher. The Court ordered Petitioner to provide his cause and prejudice and miscarriage of justice arguments in a specific format so that Respondent and the Court could understand them and analyze them in an efficient manner. Petitioner declined to do so, and instead submitted briefing that is largely nonresponsive to the particular questions at hand. Nevertheless, the Court has reviewed the entire file to determine whether Petitioner should be permitted to proceed on his defaulted claims. The Court begins its analysis with Petitioner's actual innocence arguments.

## REVIEW OF ACTUAL INNOCENCE ARGUMENT

1. **Standard of Law**

Habeas corpus law requires that a petitioner "exhaust" his state court remedies before pursuing a claim in a federal habeas petition. 28 U.S.C. § 2254(b). To exhaust a claim, a habeas petitioner must fairly present it as a federal claim to the highest state court for review in the manner prescribed by state law. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

Claims that are not properly presented to the state district court and are rejected by the state appellate courts on adequate and independent procedural grounds are deemed procedurally defaulted in this action. *Ford v. Georgia*, 498 U.S. 411, 422-24 (1991). If a petitioner's claim is procedurally defaulted, the federal district court cannot hear the merits of the claim unless a petitioner meets one of two exceptions: a showing of adequate legal cause for the default and prejudice arising from the default; or a showing of actual innocence, which means that a miscarriage of justice will occur if the claim is

not heard in federal court. *See Murray v. Carrier*, 477 U.S. 478, 488 (1986); *Schlup v. Delo*, 513 U.S. 298, 329 (1995).

"Actual innocence" means a colorable showing that one is factually, not merely legally, innocent of the charges. *Herrera v. Collins*, 506 U.S. 390, 404 (1993). To show actual innocence, a petitioner must come forward with "new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Schlup*, 513 U.S. at 324. The evidence supporting the actual innocence claim must be "newly presented" evidence of actual innocence, which means "it was not introduced to the jury at trial"; it need not be "newly discovered," which allows a petitioner to rely on evidence that was available to the defendant during his trial. *Griffin v. Johnson*, 350 F.3d 956, 962–63 (9th Cir. 2013).

The petitioner bears the burden of demonstrating that "in light of all the evidence, including evidence not introduced at trial, it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt." *Id.* at 327; *see also House v. Bell*, 547 U.S. 518, 539 (2006). The standard is demanding and permits review only in the "extraordinary" case. *Schlup*, 513 U.S. at 327 (citation omitted).

A habeas proceeding is not a proper forum in which to re-litigate an entire case that has already been tried. Instead, "[w]hen confronted with a challenge based on trial evidence, courts presume the jury resolved evidentiary disputes reasonably so long as sufficient evidence supports the verdict." *House v. Bell*, 547 U.S. at 539.

## 2. Discussion

Petitioner asserts: "My actual innocence claims are grounds to overcome the unorthodox manner in which my claims were presented, so long as the federal claim and colorable evidence was provided sufficiently; I assert that it was." (Dkt. 37, p. 15.) Petitioner alleges that four "victims [who were] misportrayed as victims . . . jumped [him] in [his] home." (State's Lodging E-8, p. 51.) However, the jury rejected Petitioner's self-defense or justifiable homicide defense and convicted him of first degree murder.

The following is a general summary of the evidence presented at trial. The Court concludes that the totality of the evidence supports the jury's verdict, and that Petitioner does not have sufficient "new evidence" to show that that no rational juror would vote to convict him if the new evidence was placed before the jury.

After his jewelry-making business failed, Petitioner found himself homeless. He most often spent the night in the converted garage of his friend, Tom Gooch; he sometimes stayed with his sister, Debbi Stokesberry; and he occasionally stayed at the rented home of Arthur Lynn Nickell and Mark "Shaggy" Olson at 222 Ramage Street (the Ramage home). Because he had no permanent home, Petitioner left his personal property (including jewelry, geodes, tools, and jewelry-making supplies) at these houses. Petitioner owned an older van at this time, and kept some of his property in the van. (State's Lodging A-6.)

Nickell classified the Ramage home as a "flop house," where people do drugs, "hang out and crash." (*Id*., pp. 324-25.) The windows were painted so people couldn't look in and see the occupants "getting high." (*Id*., p. 325.)

Petitioner, his adult daughters, and the other individuals who frequented the Ramage house were involved in drugs. (State's Lodging A-6, p. 665.) Petitioner's adult daughter, Tonja Jolley, had an on-again, off-again live-in relationship with Shaggy at the Ramage home; Tonja testified that her sister, Michelle Pullin, stayed overnight at the Ramage home perhaps once a month, and that her father, Petitioner, stayed overnight at the Ramage home perhaps twice a month. (*Id*., pp. 174-75.) Sometimes Michelle's boyfriend, Greg Grob, stayed overnight at the Ramage house. (*Id*., p. 171.) The victim, Brent "Spook" Lillevold, and his girlfriend, Shellina "Shelly" Mowrey, also visited the house regularly, but did not stay overnight there. (*Id*., p.172.)

Petitioner and witnesses testified that, prior to the night Lillevold was killed, all of the following occurred. Shaggy and Tonja had an argument in which Shaggy threatened to cut Tonja's throat. Tonja left the Ramage residence, and Shaggy gave some of Tonja's personal property to the Salvation Army. Nickell moved some of the boxes Petitioner had left at the Ramage house to a different room so he could gain access to a table that had to be moved out of the house. Lillevold took Petitioner's van (with the personal property stored in the van) and would not return it. Grob and Shelly took some of Petitioner's jewelry and Tonja's blanket to sell or trade for drugs. (State's Lodging A-6, pp. 629-30, 784.) Michelle told Petitioner that Grob was stalking her, and Petitioner told Grob to

**MEMRANDUM DECISION AND ORDER - 7**

leave Michelle alone. (*Id*, p. 785.) Petitioner made and hid a saw-offed shotgun behind the washing machine at the Ramage house. Petitioner borrowed some shotgun ammunition from Gooch. Petitioner told his sister Debbi that Lillevold had stolen his van, and Debbi urged Petitioner to go to the police. Petitioner asked Preston Emery to drive him by Shelly's house twice, and Petitioner yelled, "You're a dead man," out the window as they passed the house. Petitioner told Edward Robbins that Petitioner was going to "off someone" for stealing his van. (*Id*. at 304.)

At 3:00 a.m. on May 29, 2005, Petitioner, daughter Michelle, and son Ryan Jolley, borrowed Gooch's truck and drove from Gooch's residence to the Ramage house. Petitioner saw Lillevold's car at the Ramage house. Evidence at trial tended to show that Petitioner recognized Lillevold's car (State's Lodging A-6, p. 749), though Petitioner testified that he did not know it was Lillevold's. Petitioner stopped the truck, went inside, and left Michelle and Ryan in the truck. Petitioner retrieved his hidden shotgun. Shaggy saw Petitioner loading the shotgun, and tried to wrestle it away from Petitioner, unsuccessfully. Petitioner ordered Shaggy to enter a basement room where Lillevold, Shelly, and Grob were on or near a couch. Shaggy did so, sitting on a table to the side of Petitioner.

Petitioner called Lillevold names and held Lillevold, Shelly, Grob, and Shaggy at gunpoint while he demanded return of the van. Petitioner made the victim and eyewitnesses put their weapons on the floor, so that only Petitioner was armed. The victim and eyewitnesses put several knives on the floor. Shelly couldn't find the knife

**MEMRANDUM DECISION AND ORDER - 8**

that was in her purse, and she kept trying to show Petitioner that the purse didn't contain any money when Petitioner demanded gas money to retrieve the van. Petitioner repeatedly told Shelly to put her purse down, but she did not. (State's Lodging A-6.)

At trial, Petitioner claimed that these four people were his "enemies," and that he was afraid of them, though Petitioner focused his insults and inquiries during the gun incident on only Lillevold. Just before the gunshot, Petitioner had ordered Lillevold to take him to the van, and so Lillevold and Shelly began moving from the couch toward the door. Petitioner testified that Shelly "had a hold of the lip of the purse" and "acted like she was trying to hand it to [Lillevold]." (State's Lodging A-6, p. 708.) Petitioner testified that his four enemies then advanced upon him and attacked at the same time, with Lillevold simultaneously reaching into Shelly's purse for a handgun with one hand and reaching toward Petitioner with the other to try to grab the shotgun. (*Id.*, pp. 709-10, 756.) As Petitioner tried to shift his position to counter the four people advancing on him, his finger was pushed into the trigger, and he shot Lillevold at close range. (*Id.*, p. 711.) Petitioner testified at trial that he pulled the trigger a little on purpose and a little on accident, because he was scared and reaching for it to shoot the advancing people, but in the process, his hand hit the trigger anyway. (*Id.*, p. 712.)

The eyewitnesses' stories largely agreed that, as Petitioner held them all captive in the basement room with the couch, the only defensive actions that were taken came from Shelly, who (1) called Petitioner vulgar names and talked to him at length in what has been described as an irritating manner, (2) looked in her purse for a knife and money

**MEMRANDUM DECISION AND ORDER - 9**

when Petitioner asked her to and then continued to rummage through her purse even after he told her to put the purse down, and (3) tossed a handful of change toward Petitioner when he asked them for gas money. The eyewitness testimony showed that Lillevold, Grob, and Shaggy were unarmed, passive, and compliant with Petitioner's requests, as they faced the loaded sawed-off shotgun. Only Petitioner's testimony is inconsistent, alleging that the four people all physically attacked him.[3] (State's Lodging A-6.)

Petitioner testified at trial that he was acting in defense of his adult children and had left them outside in the car for their safety. After the shooting, Petitioner came out of the house and ordered his children to run from the scene, and Petitioner and Grob got into the truck and drove away, even though Petitioner testified that Grob was his enemy. The prosecutor argued that this circumstance showed that Petitioner was not acting in defense of his children and that he did not perceive the "enemies" as an immediate threat, or he would not have driven away with Grob and left his children behind with Shaggy.

Petitioner testified that he told Grob he was going to stop and hide the gun. Petitioner had no explanation on cross-examination why he would have told an enemy this information and why he would have left the enemy in the getaway truck while he exited the truck and hid the gun. (State's Lodging A-6, pp. 918-19.) These actions also

---

[3] Petitioner now states he shot from a waist-high position, to support his theory that he could not have shot straight across from his waist into Lillevold's upper chest unless Lillevold was bending over to attack Petitioner; at trial, Petitioner testified that he was starting to point the gun at Lillevold or Grob, when Shaggy put his hand on Petitioner's shoulder, and then Petitioner's hand hit the trigger, as Petitioner was grabbing the gun tighter and turning it. (State's Lodging A-6, 710-12.) Grob testified that Petitioner "had looked like he was going to leave and then spun around, and then that's when the gun went off." (State's Lodging A-6, p. 450.) There was no focus at trial on the height or angle of the gun when it was fired.

**MEMRANDUM DECISION AND ORDER - 10**

tended to show that Petitioner did not perceive Grob as an immediate threat, contrary to Petitioner's earlier testimony.

The forensic evidence showed the location of Lillevold's feet at the time he was shot—about two feet away from the couch where he had been ordered to sit—and showed that the shot was not fired point-blank but at least a short distance away, because there were no burn marks or soot on the body, the edges of the wound were not smooth but scalloped, the birdshot was already in a spreading pattern when it hit the victim, and the plastic wadding from the shotgun shell was found on the floor rather than inside the victim's body. The forensic evidence was consistent with eyewitness testimony that, as soon as Lillevold was shot, he turned "180° and went face down on the couch and on the floor." (State's Lodging A-2, pp. 83-85; p. 452.)

The jury heard evidence that the State's experts earlier had testified at the grand jury hearing that the shot could have been as close as eighteen inches. The State's experts explained that the added information of the footprint position and a comparison of Lillevold's wound to Dr. DiMaio's *Book on Gunshot Wounds*, Second Edition, influenced them to revise their estimation to four feet, during the time between the grand jury hearing and the trial. (State's Lodging A-6, p. 123; pp. 960-61.)

Petitioner desires to present a variety of evidence showing that the shooting could have occurred when Lillevold was eighteen inches away. Petitioner knew that blood had spattered onto his boots, because he admits to cleaning them, and that blood had spattered onto his shirt, but he did not present that evidence to the jury. In addition, he desires to

**MEMRANDUM DECISION AND ORDER - 11**

emphasize that blood spattered on the door frame; the door photograph was admitted into evidence and discussed at trial, but the blood spatter was not highlighted to support Petitioner's defense. (*Id.*, p. 955.) Petitioner faults the State for not presenting Petitioner's blood-spattered boots and shirt to the jury. However, Petitioner's counsel pointed out to the jury that the original expert's estimation had been eighteen inches, and that the wadding could have fallen out of the body onto the floor, indicating that Lillevold was attacking Petitioner when Lillevold was shot at close range.

After the shooting, Petitioner disposed of the shotgun, making it unavailable for ballistics testing. Petitioner then turned himself in to the police, and he told investigators a story that he later admitted was not altogether true. While in jail, Petitioner sent Gooch a letter that contained thinly-veiled threats (Gooch was the friend who let Petitioner stay in his garage, use a vise in the garage to make the sawed-off shotgun, borrow ammunition, and borrow Gooch's truck); Petitioner also sent Gooch copies of the photos of Lillevold's bloody body (Gooch was not among those who witnessed the shooting). Petitioner's testimony at trial was not only inconsistent with the eyewitnesses' stories, but it was internally inconsistent and flatly unbelievable at times, which undoubtedly damaged his credibility.

The problematic features of Petitioner's desired defense were succinctly articulated in a letter from Petitioner's post-conviction appellate counsel, Deborah Whipple, written after she had searched the record to determine whether there were meritorious claims to assert on appeal. The jury was instructed that Idaho law prohibits

**MEMRANDUM DECISION AND ORDER - 12**

an aggressor or provoker of an altercation in which another person is killed from claiming self-defense unless the aggressor in good faith first withdraws from further aggressive action. *See State v. Turner*, 38 P.3d 1285, 1290-91 (Idaho Ct. App. 2001). *Turner*'s facts are very similar to Petitioner's facts.

Upon her review of the record, Ms. Whipple reported to Petitioner:

> I realize that these people were inside your house stealing very valuable goods. Your aggravation and distress at this is certainly understandable. However, the state's argument will be that you were the aggressor because you entered the house after they were already inside and, instead of leaving the house and calling the police to report a burglary as soon as you heard them, you picked up the sawed off shotgun from its place by the washer and entered the room they were in to confront them. The state will argue that this was an action making you the aggressor. And, I can't see anything that I can point to after that act to demonstrate that you in good faith withdrew.

(Exhibits to Dkt. 3, Exhibit 173.)

Petitioner's self-defense argument ignores the obvious problems Ms. Whipple identified. Even if Petitioner brought forward evidence showing that the Ramage house was his own residence, the vast majority of the evidence still points to him as the aggressor and therefore supports the jury's verdict. It is undisputed that this was not a breaking and entering situation that caused Petitioner to arm himself in defense after he discovered intruders in his home, nor did the intruders display arms first. Rather, the Ramage home was open to all to come and go, and the four were already in the home when Petitioner arrived and decided to arm himself and confront them.

Even if Petitioner could show with additional forensic evidence that he shot Lillevold from eighteen inches away and that Lillevold was reaching for the sawed-off shotgun with one hand and reaching into Shelly's purse with his other hand (which seems almost humanly impossible), the vast majority of evidence still points to Petitioner as the aggressor. In such instance, Lillevold would have remained in the defensive position in trying to eradicate the threat of harm from the shotgun, and Petitioner remained the aggressor and had not put the gun down before Lillevold was killed.

The Court presumes the jury resolved the discrepancy between Petitioner's testimony and the other eyewitnesses' testimony reasonably because sufficient evidence supports the verdict. The Court concludes that—even with the new evidence of Petitioner's boots, Petitioner's shirt, and an expert opinion that Petitioner could have been shot from eighteen inches away—reasonable jurors still would have convicted Petitioner. It is extremely unlikely that additional forensic evidence would have aided Petitioner's defense, in light of the totality of evidence, including the witness testimony, the evidence of Petitioner's intent and preparations before the shooting, the threats against Gooch after the shooting, the unlikely nature of Petitioner's story, and Petitioner's credibility issues. Based on the entire record, including all of Petitioner's exhibits and the new evidence he wishes to present, the Court concludes that Petitioner has failed to show that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt. Petitioner has not shown that he is actually innocent of murder under the standards

of *Schlup* and *House*. Accordingly, the procedural default of Petitioner's claims cannot be overcome by the miscarriage of justice exception.

## REVIEW OF CAUSE AND PREJUDICE ARGUMENTS

The purpose of federal habeas corpus law is to remedy constitutional violations, regardless of the guilt or innocence of a person, out of fairness to him and for the protection of the integrity of the criminal justice system for everyone. Therefore, Petitioner's failure to meet the actual innocence standard does not prevent him from asserting grounds for cause and prejudice to overcome the procedural default of his claims.

To show "cause" for a procedural default, a petitioner must ordinarily demonstrate that some objective factor external to the defense impeded his or his counsel's efforts to comply with the state procedural rule at issue. *Murray v. Carrier*, 477 U.S. at 488. To show "prejudice," a petitioner bears "the burden of showing not merely that the errors [in his proceeding] constituted a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire [proceeding] with errors of constitutional dimension." *United States v. Frady*, 456 U.S. 152, 170 (1982).

Petitioner makes several general arguments about cause and prejudice. He argues that he asked his direct appeal counsel to bring his claims, but direct appeal counsel failed to do so. As a result, Petitioner tried to raise these claims on post-conviction review, only to be told by the state district court that he should have brought them on direct appeal. In other words, Petitioner asserts that direct appeal counsel was ineffective for failing to

**MEMRANDUM DECISION AND ORDER - 15**

bring them—which is a separate claim that itself must be exhausted before it can amount to cause for the default of another claim. *See Edwards v. Carpenter*, 529 U.S. 446 (2000) (ineffective assistance of counsel cannot serve as cause for the default of another claim unless the ineffective assistance of counsel claim is not itself procedurally defaulted or cause and prejudice for the default of the ineffective assistance claim can be shown).

Petitioner alleges that he properly exhausted the ineffective assistance of direct appeal counsel claims on post-conviction review. However, the Court has determined that Petitioner did not properly exhaust any ineffective assistance of direct appeal counsel claims through the level of the Idaho Supreme Court. Therefore, *Edwards v. Carpenter* does not apply to save any of his claims because his direct appeal counsel claims are themselves procedurally defaulted, and Petitioner has not shown cause and prejudice for the default of those claims (it was his own choice to proceed pro se in the post-conviction action and present his claims in the manner he did to the Idaho Supreme Court).

Neither does the *Martinez v. Ryan* exception apply to any of Petitioner's claims. *See Martinez v. Ryan*, 132 S.Ct. 1309, 1315 (2012) (establishing a limited exception permitting a petitioner to assert lack of counsel or ineffective assistance of counsel in initial post-conviction proceedings to establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial). In this case, Petitioner represented himself on post-conviction review as a result of his own choice. For *Martinez* to apply, the default must be attributable either to the failure of one's attorney, or the trial court's failure to appoint counsel. It is inapplicable where a petitioner assumes the risk of proceeding

without counsel in initial collateral review proceedings. *See Bender v. Wynder*, 2013 WL 3776746 (W.D. Pa. 2013) (relying on *Faretta v. California*, 422 U.S. 806, 834-35 n.46 (1975)); *cf. Cook v. Ryan*, 688 F.3d 598, 609-10 (9th Cir. 2012) (*Martinez* does not apply to instances where defendants voluntarily represented themselves at trial).

"Cause" may be shown by demonstrating a conflict of interest of counsel existed that *actually caused* the procedural default. *See Manning v. Foster*, 224 F.3d 1129, 1133 (9th Cir. 2000); *Deutscher v. Angelone*, 16 F.3d 981, 984 (9th Cir. 1994) (counsel was not acting on behalf of the petitioner where counsel filed a habeas corpus petition for the petitioner without the petitioner's knowledge or authorization). To the extent that Petitioner argues that direct appeal counsel had a conflict of interest, the allegation is empty, because Petitioner has not identified any facts showing a conflict existed. That direct appeal counsel did not agree with Petitioner's point of view that justifiable homicide and self-defense claims should have been raised on direct appeal does not, by itself, qualify as a "conflict of interest." Therefore, this argument is rejected for lack of any supporting facts or causal link.

Petitioner appears to be asserting that the default of his *Miranda* claim, presented in Claim Three(3), should be excused, because it is a claim that direct appeal counsel should have pursued. (Dkt. 37, p. 14.) As explained above, because Petitioner did not properly exhaust his direct appeal counsel claims, he cannot use them as cause for the default of other claims.

To the extent that Petitioner re-argues that his claims are not procedurally defaulted, the Court disagrees, and stands by its original rulings. Respondent has taken the time to clearly identify the particular deficiencies in the record supporting the procedural default of Petitioner's claims (Dkt. 38), and the Court will not address Petitioner's arguments again here.

## PETITIONER'S RECORD REQUESTS

Petitioner brings to the Court's attention that, in his post-conviction matter, a court order was issued permitting him to augment the record with a large number of exhibits. (Dkt. 37-1, p. 24.) He also asks the Court to augment the record in this federal habeas corpus case to include his post-conviction affidavit with 113 exhibits. He also wishes to augment the record with 196 exhibits attached to his federal Petition for Writ of Habeas Corpus filed in this matter. (Dkt. 37-1, pp. 8-17). The Court has considered these exhibits as support for Petitioner's procedural arguments at this point. To the extent that the records were properly presented to the state courts, he may present them at the merits stage of proceedings.

Petitioner also states that he is missing portions of the record: (1) the final jury instructions (State's Lodging A-2, pp. 355-69; A-3, 399-433); (2) a complete list and copy of all discovery and evidence used at trial (State's Lodging A-2, pp. 383-86); (3) a complete list of evidence in the possession of the state not used at trial (e.g., the clothes of the witnesses confiscated by police but not introduced into evidence); (4) copies of the motions and orders regarding requests and appointments of expert witnesses for the

**MEMRANDUM DECISION AND ORDER - 18**

defense (State's Lodging A-2, pp. 216-17); and (5) in camera hearing transcript regarding jury member caught watching television (State's Lodging A-6, pp. 1004-08).

The Court will order the Clerk of Court to provide items (1), (2), (4), and (5) to Petitioner. The State need not create new items for Petitioner, such as item (3), a complete list of every piece of evidence in the State's possession not used at trial, but if one exists, Respondent shall provide it to Petitioner. The use of item (3) and any item not presented to the state courts may be limited by *Cullen v. Pinholster,* 131 S.Ct. 1388, 1400 (2011).

## REMAINING CLAIMS TO BE HEARD ON MERITS

The following claims will be heard on the merits:

- Claim One, only as a claim of the violation of the right of access to the court "as guaranteed by the 1st, 5th and 14th Amendments under the Sixth Amendment right to counsel, as well as the Fifth and Fourteenth Amendments (due process clause), and the equal protection clause of the 14th Amendment" based on facts that "the jail deprived Mr. Brink of the legal materials he required to make use of that right or to otherwise participate in his defense." (See State's Lodging C-7, p. 14.)

- Claim Three (2), limited to the subclaim that the jury's exposure to facts not in evidence deprived Petitioner of the rights to confrontation, cross-examination and assistance of counsel embodied in the Sixth Amendment when the prosecutor showed a video tape recording of the crime scene during his opening statement but did not later ask to have the video admitted into evidence.

- Claim Four that Petitioner's First, Fifth, Sixth, and Fourteenth Amendment rights were violated because he was not appointed experts to review the evidence, as an ineffective assistance of counsel claim only.

# ORDER

**IT IS ORDERED:**

1. Petitioner's First and Second Motions for Extensions of Time to File Response to Order (Dkt. 32, 34) are GRANTED. The response filed at Docket No. 37 is considered timely. Respondent's Motion to Dismiss (Dkt. 12) is GRANTED.

2. Petitioner may proceed on only those claims set forth above.

3. Respondent shall file an answer to the remaining claims within 90 days after entry of this Order. The answer should also contain a brief that sets forth the factual and legal basis of grounds for dismissal and/or denial of the remaining claims. Petitioner shall prepare a reply (formerly called a traverse), containing a brief rebutting Respondent's answer and brief, which shall be filed and served within 30 days after service of the answer. Respondent has the option of filing a sur-reply within 14 days after service of the reply. At that point, the case shall be deemed ready for a final decision.

4. No party shall file supplemental responses, replies, affidavits or other documents not expressly authorized by the Local Rules without first obtaining leave of Court.

5. No discovery shall be undertaken in this matter.

Dated: **February 27, 2015**

Honorable Edward J. Lodge
United States District Judge